UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DEAN JAQUISH,

                              Plaintiff,

v.                                                          8:16-CV-0399
                                                            (GTS)
COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
_____

APPEARANCES:                                    OF COUNSEL:

SCHNEIDER & PALCSIK                             MARK A. SCHNEIDER, ESQ.
  Counsel for Plaintiff
57 Court Street
Plattsburgh, NY 12901

U.S. SOCIAL SECURITY ADMIN.                     PADMA GHATAGE, ESQ.
OFFICE OF REG'L GEN. COUNSEL – REGION II
  Counsel for Defendant
26 Federal Plaza, Room 3904
New York, NY 10278

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this Social Security action filed by Dean Jaquish

("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner")

pursuant to 42 U.S.C. § 405(g), are Plaintiff's motion for judgment on the pleadings and

Defendant's motion for judgment on the pleadings. (Dkt. Nos. 14, 18.) For the reasons set forth

below, Plaintiff's motion for judgment on the pleadings is denied, and Defendant's motion for

judgment on the pleadings is granted. The Commissioner's decision denying Plaintiff's

disability benefits is affirmed, and Plaintiff's Complaint is dismissed.

## I.    RELEVANT BACKGROUND

### A.    Factual Background

Plaintiff was born in 1961, making him 49 years old at the alleged onset date and 51 years old at the date last insured.  Plaintiff reported attending high school until the 9th grade. Plaintiff has past work as a truck driver.  Generally, Plaintiff alleges disability due to coronary artery disease, a blocked esophagus, hypertension, depression, hyperlipidemia, mental health problems, osteoarthritis, attention deficit hyperactivity disorder, missing ball joint in the right ankle, gastroesophageal reflux disease, and alcoholism.

### B.    Procedural History

Plaintiff applied for Disability Insurance Benefits and Supplemental Security Income on June 12, 2013, alleging disability beginning April 26, 2011.  Plaintiff's applications were initially denied on September 26, 2013, after which he timely requested a hearing before an Administrative Law Judge ("ALJ").  Plaintiff appeared at a video hearing before ALJ Arthur Patane on November 14, 2014.  A supplemental video hearing was held on July 31, 2015.  On October 8, 2015, the ALJ issued a written decision finding Plaintiff was not disabled under the Social Security Act.  (T. 13-34.)[1]  On March 30, 2016, the Appeals Council denied Plaintiff's request for review of his Disability Insurance Benefits application, making the ALJ's decision the final decision of the Commissioner as to that application.  (T. 1-4.)

---

[1]    The Administrative Transcript is found at Dkt. No. 8.  Citations to the Administrative Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein will be used rather than the page numbers assigned by the Court's CM/ECF electronic filing system.

## C.     The ALJ's Decision

Generally, in his decision, the ALJ made the following seven findings of fact and conclusions of law.  (T. 15-33.)  First, the ALJ found that Plaintiff was insured for disability benefits under Title II until June 30, 2012.  (T. 15.)  Second, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (*Id*.)  Third, the ALJ found that Plaintiff's affective disorder, anxiety disorder, alcohol abuse disorder, history of ischemic heart disease, high blood pressure, right foot cavus deformity and peroneal tendinitis status post-surgery, degenerative disc disease in the lower lumbar spine, and osteoarthritis are severe impairments, while high cholesterol and esophageal impairments are not severe.  (T. 15-16.)  Fourth, the ALJ found that Plaintiff's severe impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. § 404, Subpart P, App. 1 (the "Listings").  (T. 16-19.)  More specifically, the ALJ considered Listing 1.00 (musculoskeletal system), 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), 4.00 (cardiovascular system), 5.00 (digestive system), 12.04 (affective disorders), and 12.06 (anxiety related disorders).  (*Id.*)  Fifth, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is able to do simple, routine and repetitive tasks, without fast pace, production goals or quotas, can operate foot controls occasionally with the right foot and frequently with the left foot, and should avoid working at heights or around dangerous machinery.

(T. 19.)  Six, the ALJ found that the above RFC prevents Plaintiff from performing his past relevant work.  (T. 32.)  Seventh, the ALJ found that Plaintiff is not disabled at Step Five pursuant to the Medical-Vocational Guidelines because the additional limitations in the RFC have little or no effect on the occupational base of light work.   (T. 33.)

**D.      The Parties' Briefings on Their Cross-Motions**

Generally, Plaintiff makes five arguments in support of his motion for judgment on the pleadings.  First, Plaintiff argues that the ALJ failed to develop the record by not obtaining records from prior to the application date and by not asking Plaintiff's representative at the hearing to obtain material evidence that was missing from the record.  (Dkt. No. 14, at 20-22 [Pl. Mem. of Law].)  In his reply brief to Defendant's memorandum, Plaintiff elaborates that this duty to develop arose because there were "obvious gaps" in the record and the ALJ therefore did not have a complete medical history.  (Dkt. No. 22, at 4 [Pl. Reply Br.].)

Second, Plaintiff argues that the ALJ violated the treating physician rule and erred in affording greater weight to the reports from consultative sources.  (Dkt. No. 14, at 22-27 [Pl. Mem. of Law].)  Specifically, Plaintiff argues that the ALJ erred in affording more weight to the opinions of consultative physicians Dr. Wassef, Dr. Hartman, and Dr. Gussoff than to the opinions from the treating orthopedic surgeon, the treating cardiologist, the primary care providers, the treating psychiatrists, and a treating therapist.  (Dkt. No. 14, at 26 [Pl. Mem. of Law].)

Third, Plaintiff argues that he should have been found disabled due to his combination of impairments.  (Dkt. No. 14, at 27-28 [Pl. Mem. of Law].)  Plaintiff argues that the ALJ did not meet his burden at Step Five of showing that Plaintiff had the ability to perform a full range of light or sedentary work.  (Dkt. No. 14, at 28 [Pl. Mem. of Law].)  Plaintiff also argues that the ALJ failed to consider his learning disability and borderline intellectual functioning in combination with his other impairments when determining the RFC finding.  (Dkt. No. 14, at 31-32 [Pl. Mem. of Law].)  Plaintiff additionally argues that the ALJ erred in finding that heart

disease and Barrett's esophagus were non-severe impairments. (Dkt. No. 14, at 32 [Pl. Mem. of Law].)

Fourth, Plaintiff argues that the ALJ failed to provide clear and convincing rationale for discrediting Plaintiff's allegations of limitation. (Dkt. No. 14, at 32-35 [Pl. Mem. of Law].) Plaintiff argues that the ALJ failed to point to any inconsistencies to support his credibility finding, and that the factors such as Plaintiff's treatment history and work history should have enhanced his credibility. (Dkt. No. 14, at 34-35 [Pl. Mem. of Law].)

Fifth, and finally, Plaintiff argues that the ALJ erred in failing to consult a vocational expert when making the determination at Step Five. (Dkt. No. 14, at 35 [Pl. Mem. of Law].)[2]

---

[2]     Plaintiff also raises additional arguments in his reply brief, including new variations on his initial failure to develop argument, and that the Appeals Council failed to consider a report from his treating cardiologist that was submitted after the ALJ's hearing decision. (Dkt. No. 22, at 5-8 [Pl. Reply Br.].) However, Plaintiff did not raise these specific arguments anywhere in his initial brief. (Dkt. No. 14 [Pl. Mem. of Law].) The docket for this case shows that Plaintiff had initially submitted a request to file a 47-page memorandum of law in support of his motion for judgment on the pleadings, a request which Magistrate Judge David E. Peebles granted in part by allowing Plaintiff excess pages, but denied in part by limiting the maximum length to 35 pages. (Dkt. Nos. 11, 12.) Plaintiff submitted a letter of objection to this limitation, asserting that he was not waiving any facts or issues by complying with Court's order for a 35-page brief. (Dkt. No. 13.) Given this history and the fact that Plaintiff used a large portion of his reply brief (which he was granted permission by this Court to file) to raise entirely new arguments, there are reasonable grounds to suspect that Plaintiff was attempting to use his reply brief in part as a way to circumnavigate Magistrate Judge Peeble's Order regarding excess pages. Since Plaintiff did not raise these arguments in his initial brief, this Court is not required to consider or discuss them. *See Zirogiannis v. Seterus, Inc.*, 221 F. Supp. 3d 292, 298 (E.D.N.Y. 2016) (noting that "[i]t is well-established that 'arguments may not be made for the first time in a reply brief,' and that "'new arguments first raised in reply papers in support of a motion will not be considered'") (quoting *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993); *Domino Media, Inc. v. Kranis*, 9 F. Supp. 2d 374, 387 (S.D.N.Y. 1998)); *Rowley v. City of New York*, No. 00-CV-1793, 2005 WL 2429514, at *5 (S.D.N.Y. Sept. 30, 2005) (collecting cases supporting the assertion that "[t]his Circuit has made clear it disfavors new issues being raised in reply papers"). Plaintiff does not explain how it would it result in manifest injustice if the Court declines to consider these arguments. (Dkt. No. 29, at 2-3 [Pl. Rep. to Def. Sur-Reply].) However, given that this Court finds no merit in either contention, they will be discussed briefly in conjunction with Plaintiff's properly-raised arguments for the sake of thoroughness. This Court however would like to

Generally, Defendant makes five arguments in support of her motion for judgment on the pleadings. First, Defendant argues that the ALJ fulfilled her duty to make reasonable efforts to assist with the development of the record, noting that the Agency contacted sources Plaintiff identified in an effort to obtain evidence. (Dkt. No. 18, at 16-17 [Def. Mem. of Law].) Defendant also notes that Plaintiff's hearing attorney acknowledged that the record was complete other than specified records that attorney indicated he would obtain. (Dkt. No. 18, at 17 [Def. Mem. of Law].)

Second, Defendant argues the ALJ properly weighed the various opinion evidence related to Plaintiff's physical and mental functioning when formulating the RFC assessment. (Dkt. No. 18, at 18-25 [Def. Mem. of Law].)

Third, Defendant argues that the credibility finding is supported by substantial evidence, noting that the ALJ considered factors such as Plaintiff's wide range of daily activities, poor compliance with treatment, and a lack of regular treatment. (Dkt. No. 18, at 25-27 [Def. Mem. of Law].)

Fourth, Defendant argues that the ALJ properly considered Plaintiff's impairments in combination, including those he found were not severe, particularly because he considered all of the medical and non-medical evidence in the record when making his findings. (Dkt. No. 18, at 27-28 [Def. Mem. of Law].)

Fifth, and finally, Defendant argues that the ALJ was not required to seek testimony from a vocational expert because there was no evidence that Plaintiff's ability to work at the light

remind Plaintiff's counsel of the oath taken upon admission to this Court requiring that all counsel practicing before this Court conduct themselves uprightly, something which includes respecting and following this Court's orders. L.R. 83.1(a)(6).

exertional level was significantly diminished by the presence of non-exertional impairments. (Dkt. No. 18, at 28-29 [Def. Mem. of Law].)

## II.    RELEVANT LEGAL STANDARD

### A.      Standard of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence.  *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *accord Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983), *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by

substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

**B.      Standard to Determine Disability**

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. 20 C.F.R. §§ 404.1520, 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

8

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *accord McIntyre v. Colvin,* 758 F.3d 146, 150 (2d Cir. 2014). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thompson,* 540 U.S. 20, 24 (2003).

## III.    ANALYSIS

### A.    Whether This Court Has Jurisdiction to Review Plaintiff's Claims Related to His Title XVI Supplemental Security Income Application

After careful consideration, the Court answers this question in the negative, for the reasons outlined below.

As noted above in the section on the procedural history of this case, Plaintiff filed applications seeking both Disability Insurance Benefits under Title II and Supplemental Security Income under Title XVI on June 12, 2013, and the ALJ's decision on October 8, 2015, addressed the appeal of the Agency's decisions on both of these applications. (T. 13, 33.) Plaintiff's representative then submitted a request for review of the ALJ's decision to the Appeals Council on October 20, 2015. (T. 307.) This request for review makes explicitly clear that Plaintiff was appealing only the denial of Title II benefits, not the denial of Title XVI benefits. First, the subject header of this letter listed the purpose as "Request for Review of Denial of Title II Benefits." (T. 307.) Second, in the body of the letter, Plaintiff's representative wrote the following: "**Please note that he is only appealing the denial of his Title II claim**. He is not appealing the denial of his concurrent SSI claim (and will be filing a new SSI application)." (*Id.*) (emphasis in the original). However, when Plaintiff filed his complaint to initiate the current action in this Court, he claimed that jurisdiction existed under 42 U.S.C. §§ 405(g) and 1383(c) and listed both Title II and Title XVI as the basis for his appeal. (Dkt. No. 1, at 1 [Complaint].) Therefore, this Court must determine whether it has the jurisdiction to consider issues related to

Plaintiff's Title XVI claim in light of Plaintiff's failure to appeal that claim to the Appeals Council.

The Second Circuit noted in *Abbey v. Sullivan*, 978 F.2d 37 (2d Cir. 1992) that "Title II [of the Social Security Act] requires would-be litigants to present their claims in the first instances to the Secretary, and, then exhaust their administrative remedies before seeking judicial review." *Abbey*, 978 F.2d at 42 (citing 42 U.S.C. § 405(g); *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976)). Under 42 U.S.C. § 405(g), "an individual must obtain a 'final decision of the Commissioner' before a federal court can review Social Security benefit determinations." *Iwachiw v. Massanari*, 125 F.App'x 330, 330 (2d Cir. 2005) (citing *Heckler v. Ringer*, 466 U.S. 602 (1984); *Califano v. Sanders*, 430 U.S. 99, 108 (1977)). "The requirement of a 'final decision' has two components: (1) a non-waivable requirement that a claim for benefits has been presented to the Secretary, and (2) a waivable requirement that the administrative remedies prescribed by the Secretary have been exhausted." *Iwachiw*, 125 F.App'x at 330 (citing *City of New York v. Heckler*, 742 F.2d 729, 734 (2d Cir. 1984), *aff'd sub nom. Bowen v. City of New York*, 476 U.S. 467 (1986)).

The regulations promulgated by the Social Security Administration set forth a four-step process for exhausting administrative remedies. *See Escalera v. Comm'r of Soc. Sec.*, 457 F.App'x 4, 6 (2d Cir. 2011). First, the claimant must file an application for benefits and receive an initial Agency determination. *See* 20 C.F.R. § 404.902. Second, if the claimant disagrees with the initial determination, he may seek reconsideration in states where reconsideration remains a stage of the process. *See* 20 C.F.R. §§ 404.907, 404.909(a)(1). Third, if the claimant disagrees with the reconsideration determination, or resides in a state where the reconsideration stage has been eliminated, he may then request a hearing with an ALJ. *See* 20 C.F.R. §§

404.921(a), 404.933(b)(1).  If the claimant is dissatisfied with the ALJ's decision, he may request review by the Appeals Council.  *See* 20 C.F.R. §§ 404.967, 404.968(a)(1).

The Supreme Court has made clear statements that a Plaintiff seeking judicial review by a federal court of a decision related to Social Security disability benefits must first exhaust the administrative remedies provided by the Social Security Administration in order to give rise to jurisdiction.  In *Sims v. Apfel*, 530 U.S. 103 (2000), the Supreme Court stated the law related to "final decisions" and judicial review as follows:

> The Social Security Act provides that '[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such a decision by a civil action' in federal district court.  42 U.S.C. § 405(g).  But the Act does not define 'final decision,' instead leaving it to the SSA to give meaning to that term through regulations.  *See* § 405(a); *Weinberger v. Salfi*, 422 U.S. 749, 766 [] (1975).  SSA regulations provided that, if the Appeals Council grants review of a claim, then the decision that the Council issues is the Commissioner's final decision.  But if, as here, the Council denies the request for review, the ALJ's opinion becomes the final decision.  *See* 20 C.F.R. §§ 404.900(a)(4)-(5), 404.955, 404.981, 422.210(a) (1999).  *If a claimant fails to request review from the Council, there is no final decision and, as a result, no judicial review in most cases.  See* § 404.900(b); *Bowen v. City of New York*, 476 U.S. 467, 482-83 [] (1986).  In administrative-law parlance, such a claimant may not obtain judicial review because he has failed to exhaust administrative remedies.  *See Salfi, supra*, at 765-66 [].

*Sims*, 530 U.S. at 106-07 (emphasis added).

However, while "'exhaustion is the rule, waiver the exception,'" there are some instances where failure to exhaust administrative remedies may be excused.  *Pavano v. Shalala*, 95 F.3d 147, 150 (2d Cir. 1996) (quoting *Abbey*, 978 F.2d at 44).  The Supreme Court has cited the following three factors to excuse failure to exhaust administrative remedies: (1) where the claim is collateral to a demand for benefits; (2) where exhaustion would be futile; and (3) where the

plaintiff would suffer irreparable harm if required to exhaust the administrative remedies.

*Pavano*, 95 F.3d at 150 (citing *Abbey*, 978 F.2d at 44; *Bowen v. City of New York*, 476 U.S. at

483; *Mathews*, 424 U.S. at 330-32).

The Supreme Court's statement of the law in *Sims* provides clear and direct guidance in

this case. *See Sims*, 530 U.S. at 107. Plaintiff failed to request review from the Appeals Council

for his Title XVI claim and therefore there was no "final decision" as that term has been defined

by the Social Security Administration as to that application. Without a final decision, this Court

lacks the jurisdiction to review the Title XVI claim pursuant to 42 U.S.C. § 405(g). The

pertinent question therefore becomes whether there is any reason to excuse Plaintiff's failure to

exhaust his administrative remedies related to his Title XVI claim.

First, the issues raised in this action related to Plaintiff's Title XVI claim are not

collateral to his demand for benefits because his entire claim is itself a demand for benefits. As

in *Pavano*, Plaintiff is "challenging the lawfulness of the denial, and not seeking relief other than

that sought in the administrative proceeding." *Pavano*, 95 F.3d at 150. The Second Circuit has

noted that "'policies favoring exhaustion are most strongly implicated by actions [] challenging

the application of concededly valid regulations.'" *Id.* (quoting *Abbey*, 978 F.2d at 45). As

Plaintiff's complaint shows he filed the current action before this Court alleging only that the

final decision of the Commissioner denying benefits as to both Title II and Title XVI was

"wrong as a matter of law," the issues in this action are not collateral to his demand for benefits,

a factor which weighs in favor of application of the exhaustion requirement.

Second, there is no indication that exhaustion would be futile. "'To show futility, a

plaintiff must demonstrate that adequate remedies are not reasonably available or that the wrongs

alleged could not or would not have been corrected by resort to the administrative hearing

process.'" *Estate of D.B. by Briggs v. Thousand Islands Cent. Sch. Dist.*, 169 F. Supp. 3d 320, 329 (N.D.N.Y. 2016) (abrogated on other grounds) (quoting *Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 205 (2d Cir. 2007)).  Although it is not clear from the Appeals Council's denial of review whether they constrained their assessment to the period of the Title II application or considered the entire period covered by the ALJ's decision, there is a significant difference in the periods covered by Plaintiff's separate applications for benefits.  The relevant period for the Title II claim spans between the April 26, 2011, alleged onset date to the date last insured of June 30, 2012, while the relevant period of consideration for the Title XVI application would extend years later to the date of the ALJ's decision, October 8, 2015.  (T. 13, 15, 34.) Since the Title XVI application requires consideration of a large period of time that the Title II application does not, and because Plaintiff only appealed the denial of his Title II claim to the Appeals Council, this Court cannot say that requiring exhaustion as to the Title XVI claim would be futile given the large volume of medical and other evidence in the record relevant to the Title XVI claim that would not necessarily be relevant to the Title II claim.  All of this evidence could reasonably make a difference in the Appeals Council's decision to deny review were they to have the chance to consider an appeal of Plaintiff's Title XVI claim.  Even if an appeal of that claim had resulted in the same outcome (denial of review), that does not necessarily mean that requiring exhaustion is futile because there is sufficient medical evidence that would not have been applicable to the Title II claim which could suggest that the Appeals Council's analysis could have been different if it had been considering the Title XVI claim.  Additionally, there is no evidence that Plaintiff's alleged claims could not have been addressed or corrected by appealing to the Appeals Council.  There is also no evidence that administrative remedy was not available, and Plaintiff in fact did seek the available remedy related to his Title II application.

Plaintiff, through his representative, was clear about the intention to file a new Title XVI application with the Social Security Administration rather than pursue appeal of the existing one to the Appeals Council, and the fact that he did seek appeal of his Title II claim shows he was well aware that appeal was available to him on the Title XVI application had he wanted to pursue it.  There is simply nothing to suggest that requiring appeal of the Title XVI application to the Appeals Council would be futile.

Third, there is no suggestion that requiring exhaustion in this case would result in irreparable harm to Plaintiff.  As Plaintiff's representative acknowledged in the request for review to the Appeals Council, there was nothing preventing Plaintiff from filing a new Title XVI application with the Social Security Administration.  (T. 307.)  Eligibility for Title XVI benefits, unlike Title II benefits, is not tied to Plaintiff's work history and he would not be prevented from filing a new Title XVI application due to the passing of his date last insured or any other date.  Given that Plaintiff is free to file a new application for Title XVI benefits, and given that he reported he planned to do just that in his request for review to the Appeals Council, Plaintiff will not be irreparably harmed by the application of the exhaustion requirement.

Based on the above, this Court concludes that it lacks jurisdiction to review any issues related to Plaintiff's Title XVI claim based on Plaintiff's failure to exhaust his administrative remedies related to that claim.  Consequently, this Court will constrain its review to only issues related to Plaintiff's Title II application.  Plaintiff alleged disability beginning April 26, 2011, and was insured for disability benefits under Title II until June 30, 2012.  (T. 13, 15.)  Because a claimant seeking Title II benefits must show disability prior to the date last insured in order to be

entitled to benefits,[3] this Court will review only whether the final decision of the Commissioner is consistent with applicable legal standards and supported by substantial evidence as it related to the period between April 26, 2011, and June 30, 2012.

### B.     Whether the ALJ Failed to Sufficiently Develop the Record

After careful consideration, the Court answers this question in the negative for the reasons stated in Defendant's memorandum of law and sur-reply.  (Dkt. No. 18, at 16-17 [Def. Mem. of Law], Dkt. No. 25, at 1-4 [Def. Sur-Reply].)  To those reasons, the Court adds the following analysis.

Although the claimant has the general burden of proving that he or she has a disability within the meaning of the Social Security Act, "'the ALJ generally has an affirmative obligation to develop the administrative record'" due to the non-adversarial nature of a hearing on disability benefits.  *See Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999); citing *Draegert v. Barnhart*, 311 F.3d 468 (2d Cir. 2002), *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004)).  "'It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009)).  "Under the regulations, an ALJ must 'make every reasonable effort to

---

[3]      *See Swainbank v. Astrue*, 356 F.App'x 545, 547 (2d Cir. 2009) ("To be eligible for disability benefits, the claimant must demonstrate that she was disabled on the date she was last insured for benefits.") (citing *Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989)); *Perez v. Chater*, 77 F.3d 41, 43 n.2 (2d Cir. 1996) (noting that "[i]n order to be eligible to receive [Title II disability benefits], a claimant must have worked for at least 20 of the last 40 calendar quarters preceding the onset of disability"); *see also King v. Colvin*, No. 14-CV-829S, 2016 WL 1165309, at *3 (W.D.N.Y. Mar. 25, 2016) ("no matter how disabled a claimant is at the time of his application or hearing, he is only entitled to the benefits of the Act if he is able to prove disability existed prior to his date last insured.") (citing *Arnone*, 882 F.2d at 38).

help the claimant obtain medical reports from the claimant's medical sources so long as permission is granted to request such reports.'" *Janes v. Colvin*, No. 6:15-CV-1518, 2017 WL 972110, at *3 (N.D.N.Y. Mar. 10, 2017) (quoting *Hart v. Comm'r*, No. 5:07-CV-1270, 2010 WL 2817479, at *5 (N.D.N.Y. July 16, 2010)). Generally, additional evidence or clarification is sought when there is a conflict or ambiguity that must be resolved, when the medical reports lack necessary information, or when the reports are not based on medically acceptable clinical and laboratory diagnostic techniques." *Janes*, 2017 WL 972110, at *4 (citing 20 C.F.R. § 404.1520b; *Rosa v. Callahan*, 168 F.3d 72, 80 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)). However, "[w]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5 (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)).

In his initial memorandum, Plaintiff argues vaguely that the ALJ erred in failing to fully develop "the record from prior to the application date," not ensuring that all the medical records were in the file, and failing to ask Plaintiff's representative to obtain missing records. (Dkt. No. 14, at 22 [Pl. Mem. of Law].) However, as Defendant notes, Plaintiff does not indicate what evidence in particular was missing that created a gap in the record that would prevent the ALJ from having sufficient evidence to make a determination. (Dkt. No. 18, at 16-17 [Def. Mem. of Law].) In his reply brief, Plaintiff specifies that the record was deficient because the treatment notes from Plaintiff's remote ankle surgery were not in the record, because "[b]efore the ALJ wrongly assumed that [Plaintiff] did not have surgery in 1982, he should [have] explicitly either requested records from Dr. Black or asked [Plaintiff's hearing representative] to obtain that specific record [of his ankle surgery]," and because the ALJ did not ask Dr. Charlson (the source

who performed Plaintiff's more recent right ankle surgery) for additional records.  (Dkt. No. 22, at 4-5 [Pl. Reply Br.].)

Based on Plaintiff's elaboration in his reply brief on the failure to develop argument (whether proper or not), it appears that Plaintiff's only concrete identification of a way in which the ALJ failed to fully develop the record prior to the date last insured was in failing to obtain medical records from 1982 related to Plaintiff's remote right foot surgery.  However, Plaintiff's arguments do not show how this omission in any way affected the ALJ's ability to render a decision on his Title II claim.  Plaintiff's assertions that the ALJ "assumed that [Plaintiff] did not have [ankle] surgery" are clearly contradicted by the ALJ's decision.  (Dkt. No. 14, at 22 [Pl. Mem. of Law].)  The ALJ noted that "[a]lthough no significant clinical findings were documented upon examination consistent with the claimant's testimony regarding prior ankle surgeries, an X-ray of the right ankle did show evidence that an open reduction and internal fixation procedure has been done to correct a distal fracture followed by removal of the surgical plate, but did not demonstrate any bony abnormalities. [] The X-ray, of course, does not establish when that surgery took place."  (T. 22.)  These statements and the rest of the ALJ's discussion of the related evidence show that the ALJ did not refuse to believe that a remote ankle surgery had occurred, but rather that the evidence since the alleged onset date showed that Plaintiff's remote ankle injury and surgery did not show any functional effects or symptoms related to that injury and surgery.  Consequently, Plaintiff's assertions that the ALJ failed to consider Plaintiff's prior ankle surgery as a result of his failure to obtain the records related to that surgery are without merit.

Nor has Plaintiff shown how evidence from 1982 would be material in the instant case where the alleged onset date is April 26, 2011, nearly 30 years after when Plaintiff alleges he had

his ankle surgery. The earnings records indicate that Plaintiff worked in every year from 1984 to 2008, with the majority of those years showing earnings at or above the level of substantial gainful activity. (T. 225-26.) Given that these records serve as evidence that Plaintiff remained able to perform medium exertional level truck driving jobs requiring use of his right foot for many years after his remote right ankle surgery, there is nothing to suggest that records related to this surgery would have in anyway influenced the ALJ's decision. The ALJ acknowledged that the more recent x-rays showed evidence the surgery had taken place and considered the evidence since the alleged onset date that failed to show complaints, symptoms, or functional limitations related to Plaintiff's right ankle until September 2012 when Plaintiff suffered a new injury to his right ankle. (T. 22, 359-63.) The only notation of right ankle symptoms prior to the September 2012 re-injury was a treatment note from May 2009 (two years prior to the alleged onset date) which showed Plaintiff walked with a slight limp and had only slightly decreased ankle motion secondary to an old ankle injury. (T. 583.) Consequently, substantial evidence supports the ALJ's conclusion that Plaintiff's history of remote ankle injury and surgery did not affect his functioning during the relevant period after his alleged onset date and there was no requirement for the ALJ to obtain records from the 1980s related to that impairment. (T. 22.)

Additionally, as Defendant notes in her brief, the record shows that the ALJ did make reasonable efforts to obtain additional information and relied on representations by Plaintiff's hearing representative regarding who was going to obtain certain identified outstanding records. At the initial hearing on November 14, 2014, in response to the ALJ's questions regarding whether the record was complete, Plaintiff's hearing representative indicated it was other than waiting for possible evaluation records from Clinton County Mental Health, though he was unsure any records would result because that provider had recently been refusing to provide

notes from treatment sessions. (T. 58.) The ALJ indicated a willingness to subpoena those treatment notes if the source refused to provide them. (*Id*.) When the ALJ offered to subpoena these mental health records, Plaintiff's representative answered that "[t]hat may not be necessary" and indicated he would attempt to call the source first. (T. 59.) The ALJ assented to this plan and instructed Plaintiff's representative to keep him informed regarding the status of that records request so that he could issue a subpoena if necessary. (T. 59-60.) The record does contain treatment notes from Clinton County Mental Health, so it appears that these records were in fact successfully obtained. (T. 586-628.) Given that Plaintiff's hearing representative alleged that these were the only missing records from an otherwise complete record, it was reasonable for the ALJ to rely on that representation in this case. The duty to assist in developing the record does not go so far as to require the ALJ to independently search for every available record in existence, particularly where a claimant's representative expresses a belief that the record is complete and there was no obvious or glaring gap in the evidence that would have alerted the ALJ that the representative was incorrect. The ALJ here made reasonable inquiries regarding the status of the record and showed he was willing to assist Plaintiff's representative in obtaining any records that were missing. Plaintiff has not shown how the ALJ's actions in assisting with record development fell below what was required by the regulations.

Plaintiff also argues that the ALJ erred in failing to obtain treatment records from Dr. Charlson, the surgeon who Plaintiff reported performed his more recent right foot and ankle surgery in 2014. (Dkt. No. 22, at 5 [Pl. Reply Br.].) However, the Court need not address this argument because, in addition to the fact that this argument was improperly submitted to the Court for the first time in Plaintiff's reply brief, it lacks the jurisdiction to review the merits of Plaintiff's Title XVI claim as already discussed above in section III.A of this Decision and

Order.  In April 2015, Dr. Charlson submitted opinions restricting Plaintiff to sedentary work and indicating his ankle condition would impose life-long effects on his functioning.  (T. 730, 732.)  However, Dr. Charlson treated Plaintiff for an ankle injury that occurred after the June 30, 2012, date last insured.  (T. 359-63.)  Because the impairment that was the subject of Dr. Charlson's treatment and opinion did not exist prior to the date last insured, Dr. Charlson's treatment of such of an impairment would have no bearing on the assessment of disability within the relevant period of the Title II application.  Consequently, this Court lacks the jurisdiction to review this portion of Plaintiff's argument.

For all the above reasons, and because Plaintiff has not identified a gap that existed that would prevent the ALJ from making a determination as to the Title II period, the ALJ did not fail to meet his duty to assist in developing a full record.  Remand is not merited on this basis.

**C.     Whether the Weight Afforded to the Opinion Evidence Was Consistent With Applicable Legal Standards and Supported By Substantial Evidence**

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law.  (Dkt. No. 18, at 18-25 [Def. Mem. of Law].)  To those reasons, the Court adds the following analysis.

The Second Circuit has long recognized the 'treating physician rule' set out in 20 C.F.R. § 404.1527(c).  "'[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.'"  *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)).  However, there are situations where the treating physician's opinion is not entitled to controlling weight, in which case the

20

ALJ must "explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.'" *Greek*, 802 F.3d at 375 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013)). However, "[w]here an ALJ's reasoning and adherence to the Regulations is clear, she is not required to explicitly go through each and every factor of the Regulation." *Blinkovitch v. Comm'r of Soc. Sec.*, No. 3:15-CV-1196, 2017 WL 782979, at *4 (N.D.N.Y. Jan. 23, 2017), Report and Recommendations adopted by 2017 WL 782901 (N.D.N.Y. Feb. 28, 2017)) (citing *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013)). After considering these factors, "the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" *Greek*, 802 F.3d at 375 (quoting *Burgess*, 537 F.3d at 129). "The failure to provide 'good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand.'" *Greek*, 802 F.3d at 375 (quoting *Burgess*, 537 F.3d at 129-30).

The factors for considering opinions from non-treating medical sources are the same as those for assessing treating sources, with the consideration of whether the source examined the claimant replacing the consideration of the treatment relationship between the source and the claimant. *See* 20 C.F.R. § 404.1527(c)(1)-(6). Additionally, when weighing opinions from sources who are not considered "medically acceptable sources"[4] under the regulations, the ALJ must consider the same factors as used for evaluating opinions from medically acceptable

---

[4]    Medically acceptable sources are noted to include the following: licensed physicians; licensed or certified psychologists; licensed optometrists; licensed podiatrists; and qualified speech-language pathologists. SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).

sources. *Saxon v. Astrue*, 781 F. Supp. 2d 92, 104 (N.D.N.Y. 2011) (citing *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010)); SSR 06-03p, 2006 WL 2329939.

Plaintiff argues vaguely that the ALJ erred in relying on opinion evidence from examining and non-examining sources over those from various unnamed treating physicians and a therapist. (Dkt. No. 14, at 26-27 [Pl. Mem. of Law].) Plaintiff argues that "[t]he ALJ did not provide clear and convincing reasons for doing this. Dr. Wassaf is a pediatrician. Psychologist Dr. Hartman is not a psychiatrist. Dr. Gussoff did not examine [Plaintiff.] His testimony at the hearing was ambiguous at times and he often did not directly answer the question before him." (*Id.*) These do not provide sufficient reasons on their own to disregard any of these opinions. The fact that Dr. Wassaf is a pediatrician might merit lessening somewhat the weight his opinion is entitled to, but he is still a licensed physician with medical training who would be competent to perform a physical examination on an adult.[5] The fact that Dr. Hartman might be a psychologist rather than a psychiatrist means little, since he was qualified to assess mental illness with either credential. The specialty of a physician, while a factor the ALJ must consider, is only one factor that must be balanced against a host of other considerations when weighing opinion evidence and is not itself dispositive. *Greek*, 802 F.3d at 375 (quoting *Selian*, 708 F.3d at 418). The ALJ pointed to other factors that supported affording weight to these opinions, including the examining relationship, the support for their opinions from their examination findings and from

---

[5]     Plaintiff does also argue that the ALJ should not have afforded significant weight to Dr. Wassaf's opinion by citing to a case in which this Court found the ALJ's reliance on Dr. Wassaf's opinion was in error. (Dkt. No. 14, at 26 [Pl. Mem. of Law].) However, from the portion Plaintiff quotes, it is clear the factual situation of that case differs from the case now before this Court. Unlike in that case, the ALJ here did not afford Dr. Wassaf's opinion controlling weight. Also unlike in that case, this Court does not find that Dr. Wassaf's opinion is unsupported or outdated. Given the differences in factual situations, the case Plaintiff cites does not direct an outcome in this case.

the findings of other sources in the record, and Plaintiff's treatment history. (T. 26, 31-32.) The ALJ's discussion of the weight afforded to these opinions is consistent with his obligation under the regulations.

In terms of Dr. Gussoff's opinion, Plaintiff does not point to what portions of Dr. Gussoff's testimony are ambiguous. (Dkt. No. 14, at 26 [Pl. Mem. of Law].) Plaintiff does highlight an instance in which he believes Dr. Gussoff failed to answer a question related to whether he agreed with Dr. Charlson's conclusion that Plaintiff's right foot impairment would remain a life-long issue. (Dkt. No. 14, at 3-4 [Pl. Mem. of Law].) However, Plaintiff's interpretation is not reasonable. Dr. Gussoff answered that the post-surgical hardware would result in life-long differences unless they were removed and could result in occasional pain and compromise of functioning particularly if he engaged in a lot of stair climbing or driving, but that it would not be likely to cause much of a compromise of functioning on an ordinary day-to-day basis. (T. 50; Dkt. No. 14, at 3 [Pl. Mem. of Law].) Dr. Gussoff then noted that he accepted Dr. Charlson's opinion in good faith but reached his own conclusions based on considering the totality of the evidence. (T. 51; Dkt. No. 14, at 3-4 [Pl. Mem. of Law].) This Court does not agree with Plaintiff that Dr. Gussoff failed to answer the question that was posed to him, or that his answers to this or other questions were overly ambiguous so as to render them unreliable or suspect. Dr. Gussoff provided a clear statement of his opinion regarding Plaintiff's functional abilities, to which the ALJ afforded only some weight based on a few specific problems with Dr. Gussoff's explanations that the ALJ identified and acknowledged. (T. 26-28.) Because the ALJ's lengthy and thoughtful discussion of Dr. Gussoff's opinion and testimony shows he engaged in significant and thorough consideration of all of the factors impacting the amount of

weight this opinion was entitled to, this Court does not find any legal error in the ALJ's assessment of this opinion.

As well as failing to provide persuasive reasons as to why it was improper for the ALJ to rely on the opinions from Dr. Wassaf, Dr. Hartman, and Dr. Gussoff, Plaintiff also fails to allege any reasons as to why the ALJ was required to afford greater weight to any of the treating physician opinions. (Dkt. No. 14, at 26-27 [Pl. Mem. of Law].) The ALJ provided thorough discussions of these sources' opinions, the factors he considered when weighing them, and the reasons for the weight he ultimately afforded to each opinion. (T. 25-31.) Plaintiff does not provide any argument as to why any of these sources were entitled to greater weight other than for the sole reason that they had a treating relationship. However, the relationship between a source and a claimant is only a single factor that must be considered. *Greek*, 802 F.3d at 375 (quoting *Selian*, 708 F.3d at 418). The ALJ's discussion shows that he considered the multitude of factors required under the regulations and this Court finds no error in his application of the treating physician rule.

It is important to reiterate that, in assessing whether the ALJ's findings are supported by substantial evidence, this Court is constrained by the fact that it only has jurisdiction to review Plaintiff's Title II claim. The medical evidence for the period between April 26, 2011, and June 30, 2012, contains little evidence of physical impairment other than a two-day hospital admission for syncope and chest pain after which Plaintiff was released with instructions to resume normal activities, an emergency room visit related to a head injury after falling from a bicycle, some instances of treatment for gastrointestinal issues that are not indicative of functional limitations, and an instance of treatment for a lumbosacral strain that showed pain with range of motion. (T. 310, 314, 338-43, 346, 350, 378-80, 469-479.) The evidence from the relevant period also

contains multiple presentations to the emergency room (some resulting in multi-day hospital admissions) for depression and suicidal thoughts, but all of these reports also note that Plaintiff was drinking at those times and suggest that alcohol was a contributory factor in the acute exacerbation of his mental health symptoms. (T. 326-30, 331-35, 415-34, 446-61.) Presented with the question of whether the ALJ's findings were supported by substantial evidence as to the Title II period, this Court finds that they were, particularly based on the lack of evidence supporting the severity of symptoms and limitations opined by the treating sources that the ALJ afforded less weight.

Additionally, as previously noted, Plaintiff asserted for the first time in his reply brief that the Appeals Council erred in failing to consider a November 4, 2015, medical report from treating cardiologist Dr. Hastings. (Dkt. No. 22, at 5-8 [Pl. Reply Br.].) Setting aside Plaintiff's failure to raise this argument in his initial brief and the question of whether the treatment note even constitutes an opinion of disability from Dr. Hastings rather than a recording of Plaintiff's own reports of disability, there is no suggestion that the Appeals Council failed to consider this evidence. In the Appeals Council's denial of review, it notes that it considered Plaintiff's request for review and the additional evidence listed with its order, but "concluded that the additional evidence does not provide a basis for changing the Administrative Law Judge's decision." (T. 2.) The Appeals Council's order specifically lists Dr. Hasting's medical report in the exhibit list. (T. 4.) Therefore, Plaintiff's assertion that "the Appeals Council did not even reference it in its denial of [Plaintiff's] appeal" is clearly contradicted by the Appeals Council's order. (Dkt. No. 22, at 8 [Pl. Reply Br.].) This Court is also persuaded by Defendant's argument that a mere statement that a claimant is disabled would not be sufficient to provide a reasonable basis for changing the ALJ's decision because it is an opinion on an issue reserved to the Commissioner

that is not entitled to any significant weight.  *See Mortise v. Astrue,* 713 F. Supp. 2d 111, 125

(N.D.N.Y. 2010) ("[A]n opinion concerning the ultimate issue of disability, from any source, is

reserved to the commissioner."); *Fuimo v. Colvin*, 948 F. Supp. 2d 260, 267 (N.D.N.Y. 2013)

(noting that it was proper for the ALJ to give little weight to an opinion that the plaintiff was

severely disabled and not competitively employable because that concerned an issue reserved to

the Commissioner) (citing 20 C.F.R. § 416.927(d)(1)).  Combined with the fact that the copy of

Dr. Hasting's report contains no objective findings supporting disability and in fact notes that

Plaintiff was doing fairly well from a cardiac standpoint, a statement that Plaintiff is disabled by

itself is not persuasive evidence to override the other substantial evidence underlying the ALJ's

findings.  To the extent that this report could provide evidence related to Plaintiff's conditions

prior to the date last insured (there was evidence that a cardiac impairment was present in 2011

and 2012), there is no suggestion that the Appeals Council failed to appropriately consider this

report when deciding to deny review of Plaintiff's Title II claim.

　　　　For all of the above reasons, the ALJ and the Appeals Council appropriately considered

the opinion evidence and remand is not warranted on this basis.

　　　　**D.　　Whether the RFC Finding Appropriately Accounts for Plaintiff's Limitations
　　　　　　　　Resulting from His Combination of Impairments**

　　　　After careful consideration, the Court answers this question in the affirmative for the

reasons stated in Defendant's memorandum of law.  (Dkt. No. 18, at 27-28 [Def. Mem. of Law].)

To those reasons, the Court adds the following analysis.

　　　　Residual functional capacity is defined as "'what an individual can still do despite his or

her limitations . . . Ordinarily, RFC is the individual's maximum remaining ability to do

sustained work activities in an ordinary work setting on a regular and continuing basis.'"  *Pardee*

*v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (quoting *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999)).  "In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee*, 631 F. Supp. 2d at 210 (citing 20 C.F.R. § 404.1545(a)).  "Ultimately, '[a]ny impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment.'"  *Hendrickson v. Astrue*, No. 5:11-CV-0927, 2012 WL 7784156, at *3 (N.D.N.Y. Dec. 11, 2012) (quoting SSR 85-15, 1985 WL 56857, at *8).

Plaintiff makes three arguments related to the ALJ's assessment of his impairments as accounted for in the RFC.  First, Plaintiff argues that his foot and ankle impairment prevented him from being able to perform light work as specified in the RFC.  (Dkt. No. 14, at 28-30 [Pl. Mem. of Law].)  However, as already discussed above in section III.B. of this Decision and Order, the evidence from the time period relevant to the Title II claim does not show any evidence of limitations related to Plaintiff's right ankle, as his remote surgery from the 1980s did not appear to cause significant lasting symptoms and he did not reinjure his ankle until September 2012, after the date last insured.  Because this Court has jurisdiction to consider only issues related to Plaintiff's Title II claim due to his failure to exhaust administrative remedies as to his Title XVI claim, it cannot conclude that the evidence from the period between April 26, 2011, and June 30, 2012, indicates any greater limitations as a result of Plaintiff's right ankle impairment than was accounted for in the RFC determination as it related to that time period.  Consequently, Plaintiff's first argument must fail.

Second, Plaintiff argues that the ALJ failed to find he had greater attention and concentration difficulties and failed to consider his borderline intellectual functioning in

combination with his other impairments.  (Dkt. No. 14, at 31-32 [Pl. Mem. of Law].)  While the

evidence from prior to the alleged onset date does show the presence of mental health symptoms

during emergency room and hospital admissions, these reports do not suggest the moderate to

severe impairment in concentration and persistence that Plaintiff asserts.  While Plaintiff was

observed during a psychiatric hospital admission on November 13, 2011, to be unable to repeat

digits, to have difficulty with simple calculations and serial sevens testing, and to have difficulty

remembering provided words after five minutes, Plaintiff was also noted to have a high blood

alcohol content ("BAC") of 0.314 at the time.  (T. 334-35.)  However, when assessed by Dr.

Hartman in September 2013 while assumedly sober, he was observed to have only mildly

impaired concentration, attention, and memory.  (T. 525.)  As the ALJ explicitly noted in his

decision, the records of mental health treatment during the relevant period suggest that

documented alcohol abuse and intoxication significantly exacerbated Plaintiff's mental health

symptoms.  (T. 28-29.)  Contrary to Plaintiff's assertion that the ALJ was not allowed to factor in

the impact of Plaintiff's alcohol abuse in the absence of finding Plaintiff was disabled with

alcohol abuse as a material factor, the ALJ was entitled to consider all of the evidence before him

and the relevant Agency guidance regarding the evaluation of substance abuse in conjunction

with other impairments does not indicate otherwise.  *See* SSR 13-2p;[6] *see also* (Dkt. No. 14, at

---

[6]     SSR 13-2p indicates that "a claimant 'shall not be considered to be disabled . . . if
alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's
determination that the individual is disabled.'"  SSR 13-2p.  Plaintiff's argument is therefore
backwards: SSR 13-2p does not indicate that the ALJ is precluded from considering the effect of
substance or alcohol abuse unless he finds the claimant disabled, but rather that the ALJ must
consider the effects of substance or alcohol abuse if he finds the claimant disabled as a result of
his combination of impairments including substance or alcohol abuse.  Because the ALJ found
that Plaintiff was not disabled even when considering the effects of alcohol abuse, the issue of
materiality has no bearing on this case.

35 [Pl. Mem. of Law].)  Where, as here, the evidence clearly suggests that Plaintiff experienced some temporary deficits in concentration and other difficulties when in a state of significant intoxication, the ALJ was not required to account for these difficulties in the RFC, which is intended to stand as a description of an individual's functioning for "sustained work activities in an ordinary work setting on a regular and continuing basis."  *Pardee*, 631 F. Supp. 2d at 210.  Notably, there is no evidence showing that Plaintiff experience such significant deficits in attention, concentration, or memory on a regular basis.

Additionally, although Plaintiff argues that the ALJ was required to give greater consideration to the effects of borderline intellectual functioning, Plaintiff fails to point to evidence showing that this impairment imposed any limitations on Plaintiff's work-related functioning.  (Dkt. No. 14, at 31-32 [Pl. Mem. of Law].)  While Plaintiff asserts that "all of the examiners agreed that [Plaintiff] had borderline intelligence," he fails to point to an appropriate diagnosis to show a medically determinable impairment existed during the relevant time period.  (Dkt. No. 14, at 32 [Pl. Mem. of Law].)  While Dr. Hartman noted that Plaintiff appeared to have intellectual functioning in the borderline range, he did not conclude any such diagnosis, noting only that Plaintiff had a "learning disorder, by history."  (T. 526-27.)  While sources at Clinton County Mental Health did note that Plaintiff was diagnosed with borderline intellectual functioning beginning November 1, 2013, this does not by itself suggest that Plaintiff experienced work-related limitations from this impairment.  (T. 590.)  Notably, despite having limited intellectual functioning, Plaintiff had been able to work consistently throughout his life prior to 2008, suggesting his intellectual functioning had not posed a barrier to his abilities to work in the past if that impairment was of an organic rather than a more recent traumatic origin.  (T. 225-26.); *see also Talavera v. Astrue*, 697 F.3d 145, 152 (2d Cir. 2012) (adopting the

principle that "it is reasonable to presume, in the absence of evidence indicating otherwise, that claimants will experience a 'fairly constant IQ throughout [their] li[ves]'") (alteration in the original) (citations omitted).  Additionally, as it is not clear that this impairment did in fact exist prior to the November 2013 diagnosis, there is a question of whether borderline intellectual functioning is relevant to the assessment of Plaintiff's functioning during the time period for the Title II application.  Because there is little evidence to support functional effects from such an impairment, any failure to consider it would be at most harmless error that would not have impacted the RFC assessment.

Third, Plaintiff argues that the ALJ erred in failing to find cardiac and gastrointestinal impairments to be severe at Step Two of the sequential evaluation.  (Dkt. No. 14, at 32 [Pl. Mem. of Law].)  "Although the Second Circuit has held that this step is limited to 'screening out *de minimis* claims' [], the 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition severe." *Taylor v. Astrue*, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012) (quoting *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995); *Colvin v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995)).  Overall, the claimant retains the burden of presenting evidence to establish severity. *Taylor*, 32 F. Supp. 3d at 265 (citing *Miller v. Comm'r of Soc. Sec.*, No. 7:05-CV-1371, 2008 WL 2783418, at *6-7 (N.D.N.Y. July 16, 2008)).  This Court has also indicated that the failure to find a specific impairment severe at Step Two is harmless where the ALJ concludes there is at least one other severe impairment, the ALJ continues with the sequential evaluation, and the ALJ provides explanation showing he adequately considered the evidence related to the impairment that is ultimately found non-severe. *Fuimo v. Colvin*, 948 F. Supp. 2d 260, 269-70 (N.D.N.Y. 2013) (citing *Dillingham v. Astrue*, No. 09-CV-0236, 2010 WL 3909630 (N.D.N.Y. Aug. 24,

2010), Report and Recommendation adopted by 2010 WL 3893906 (N.D.N.Y. Sept. 30, 2010));

*see also Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding that any error in failing to find plaintiff's anxiety and panic disorder severe at Step Two would be harmless because the ALJ found other severe impairments present, continued through the sequential evaluation process, and specifically considered plaintiff's anxiety and panic attacks at those subsequent steps).

As an initial matter, Plaintiff's argument that the ALJ failed to find his cardiac impairments severe is baffling given that the ALJ specifically listed history of ischemic heart disease as a severe impairment and discussed the evidence related to this impairment within the decision. (T. 16, 21; Dkt. No. 14, at 32.) Regarding Plaintiff's gastrointestinal impairments, including Barrett's esophagus, Plaintiff's argument fails to show in any way how this relatively mild impairment imposed any limitations on his work-related functioning. (Dkt. No. 14, at 32 [Pl. Mem. of Law].) The ALJ discussed the evidence related to this impairment, including statements from Plaintiff's treating physician that he remained largely asymptomatic and that his medications were largely effective at controlling his symptoms related to his gastrointestinal impairments. (T. 16.) Plaintiff failed to meet his burden to show that this impairment was severe, or that the ALJ otherwise failed to consider the evidence related to this impairment when reaching his conclusions.

For all of the above reasons, the ALJ appropriately considered all of Plaintiff's impairments in combination when assessing the RFC, and remand is not warranted on this basis.

**E.    Whether the Credibility Finding is Supported By Substantial Evidence**

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law.  (Dkt. No. 18, at 25-27 [Def. Mem. of Law].)  To those reasons, the Court adds the following analysis.

In determining whether a claimant is disabled, the ALJ must also make a determination as to the credibility of the claimant's allegations.  "'An administrative law judge may properly reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'"  *Schlichting v. Astrue*, 11 F. Supp. 3d 190, 205 (N.D.N.Y. 2012) (quoting *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)).  The Second Circuit recognizes that "'[i]t is the function of the [Commissioner], not [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant,'" and that "[i]f there is substantial evidence in the record to support the Commissioner's findings, 'the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain.'" *Schlichting*, 11 F. Supp. 3d at 206 (quoting *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983); *Aponte v. Sec'y, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)).  Due to the fact that the ALJ has the benefit of directly observing a claimant's demeanor and "other indicia of credibility," the ALJ's credibility assessment is generally entitled to deference.  *Weather v. Astrue*, 32 F. Supp. 3d 363, 381 (N.D.N.Y. 2012) (citing *Tejada v. Apfel*, 167 F.3d 770, 776 (2d Cir. 1999)).

Plaintiff essentially argues that the ALJ failed to provide any clear reasons or explain any inconsistencies that supported his adverse credibility finding.  (Dkt. No. 14, at 34-35 [Pl. Mem.

of Law].)  However, as Defendant notes, Plaintiff ignores the multiple reasons the ALJ provided to support his conclusion, including Plaintiff's wide range of daily activities, his poor compliance with treatment, and a lack of regular treatment.  (Dkt. No. 18, at 25-27 [Def. Mem. of Law].)  In addition to these reasons, the ALJ also included a lengthy and thorough discussion of the medical treatment evidence that indicated Plaintiff's allegations were inconsistent with the medical evidence.  (T. 21-32.)  Given the significant deference this Court is required to give to an ALJ's credibility determination, and that consideration of the evidence shows that the ALJ's provided reasons are supported by substantial evidence, this Court declines to substitute its own credibility analysis for that of the ALJ.  *See Weather*, 32 F. Supp. 3d at 381.  Additionally, while Plaintiff is correct that he had a fairly good work history, such a fact is not sufficient by itself to entitle him to a finding that he is fully credible.  Rather, it is only one factor that should be considered in conjunction with all others.  *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998); *see also Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (finding other credibility factors outweighed claimant's good work history).  For the above reasons, the ALJ's credibility finding is supported by substantial evidence, and remand is not warranted.

**F.**     **Whether the Step Five Finding is Supported By Substantial Evidence**

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law.  (Dkt. No. 18, at 28-29 [Def. Mem. of Law].)  To those reasons, the Court adds the following analysis.

Although the claimant has the general burden to prove he has a disability under the definitions of the Social Security Act, the burden shifts to the Commissioner at Step Five "'to show there is other work that [the claimant] can perform.'"  *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (quoting *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 445 (2d Cir. 2012)).  "If a

claimant has non-exertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert*." Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)). "However, the 'mere existence of a non-exertional impairment does not automatically . . . preclude reliance on the [Medical-Vocational] guidelines.'" *Zabala*, 595 F.3d at 410-11 (quoting *Bapp*, 802 F.2d at 603). "A non-exertional impairment 'significantly limits a claimant's range of work when it causes an additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'" *Zabala*, 595 F.3d at 410-11 (quoting *Bapp*, 802 F.2d at 605-06).

The ALJ found that the additional limitations in the RFC would have "little or no effect on the occupational base of unskilled light work," and consequently concluded that application of the Medical-Vocational Guidelines was appropriate to direct a finding that Plaintiff was not disabled at Step Five. (T. 33.) As already noted above, the evidence from the time period relevant to this Court's review does not reveal the presence of significant non-exertional limitations. In his brief, Plaintiff alleges only vaguely that he has "non-exertional limitations of pain, fatigue, and mental illness," but does not explain what evidence shows those alleged limitations, if in fact present, imposed significant limitations on his ability to perform the range of unskilled light work contrary to the ALJ's findings. (Dkt. No. 14, at 35 [Pl. Mem. of Law].) This Court concludes that the ALJ's Step Five finding is supported by substantial evidence without testimony from a vocational expert at least as far as the period between April 26, 2011, and June 30, 2012, is concerned. Consequently, remand is not warranted on this issue.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 14) is

**DENIED**; and it is further

**ORDERED** that Defendant's motion for judgment on the pleadings (Dkt. No. 18) is

**GRANTED**; and it is further

**ORDERED** that Defendant's decision denying Plaintiff disability benefits is

**AFFIRMED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

Dated: September 6, 2017
      Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge